*536 OPINIÓN of the Court, by
Judge Boyle.
Red* ding filed his bill in chancery, in which he alleges, that j,e hjre(j of Margaret.Hall, late MargareCLevvis, a ne-gro woman for one year, tor wmch he executed his note for the sum of £. 7 Is. That shortly after he got the ne-&ro woman into his possession she was taken sick, and that upon application to said Margaret, she directed him to employ a physician to attend the negro woman in her s;ckness anci engaged to give a credit upon the note, for the amount of the physician s bill ; that accordingly he did employ » physician, and paid his bill to the 30101101 °* £• 4 4s. which together with a credit endorsed, on the note, would nearly have discharged it ⅜ *537 bat that said Margaret refuses to give a credit therefor, and that she and her husband, Austin Hall, whom he makes defendants to his bill, have brought suit upon the note, and recovered judgment at law, to stay proceedings upon which he prayed an injunction.
slave, and to employ a phy-fician if neces-saiy j a palpable neglect ⅛ this respect* would render the hirer res* The hirer of aslave isbound a°te^¡yon^rotp¡^ health of the ponfibie t® the owae/*
The defendants in their answer, admit that the negro woman was hired to the complainant, and that for the price of the hire a note was executed by him, upon which they have brought suit and recovered judgment at law. They also admit that the negro woman was taken sick, but the defendant Margaret, positively denies that she directed the complainant to employ a physician, or engaged to allow a credit on the note for the amount of his bill.
The complainant sufficiently proved by the depositions taken in the cause, the employment of the physician, and the payment of his bill, but totally failed to shew that it was done at the instance of the defendant Margaret, or that she engaged to give him a credit for the amount.
On the final hearing in the circuit court, the injunction was dissolved, and the bill decreed to be dismissed with damages and costs ; to reyerse which decree, this writ of error is prosecuted.
The only question made in this case is, whether the complainant who is now plaintiff, is entitled to a credit for the amount of the physician’s bill ?
Though the amount in controversy is inconsiderable, yet the principles involved in the question are interesting to the community. We have therefore bestowed upon the subject, more attention than the smallness of the sum in dispute would otherwise seem to have de* manded.
The solution of the question propounded, was supposed in the argument to depend in some measure upon the liability of the proprietor to abate or discount of the price of the hire of a slave a sum proportioned to the time the slave has been unable to labor from, disease or death. When the proprietor has stipulated in the contract of hire for a proportional abatement in case of sickness or death, or where the slave at the time of the hire was unsound, and there was any misrepresentation or artifice used in concealing the defect, the principle upon which the proprietor would be liable to make the *538 discount or abatement is obvious. But where he is bound by no express stipulation, and is guilty of no fraud, his liability is at least very problematical. The question of his liability in such case has never been directly decided by the English courts, nor has it, so far as we know, occurred in any case adjudicated by the courts of the United States. The principle however, seems to be involved in the cases of rent for houses, or landsj where the demised premises have been destroyed, or rendered untenable and useless by inevitable casualty. Upon this subject the cases are numerous, and though somewhat contradictory, the result from the whole ap* pears to warrant the conclusion, that the tenant is not excused from the payment of the rent on account of the destruction, nor is entitled to an abatement because of the deterioration of the premises by unavoidable accident; a distinction is taken between a duty created by law, and one created by the act of the party. Where the law creates a duty and the party is disabled to perform it, without any fault in him, the law will excuse him ; as in case of waste, if a house be destroyed by tempest or by enemies the lessee is excused, so in escape if a prison be destroyed by tempest or enemies, the goaler is not responsible ; but when a party by his own contract creates a duty or charge upon himself, he is bound to make it good, if he can, notwithstanding any accident by •inevitable necessity, because he might have provided against it by his contract ; and therefore if a lessee covenant to repair a house, though it be burnt by lightning or thrown down by enemies, yet he is bound to repair it — 2 Sand -rs, p. 422, note 2 — 1 Fonbl. p. 375, and the cates there cited. Williams in his note to Sanders, to which we have just referred, observes that u it was this liability of she tenant to rebuild, notwithstanding the house he burnt down by accident or thrown down by tempest thrt in all probability occasioned an exception, now freq uently introduced in leases, of casualties by fire and sometimes by wind and tempest.” But he adds even then, the lessee is bound to pay the rent during the term, although the house should be burnt or thrown down, if there be an express covenant for the payment of the rent, for the same reason, and upon the same principle that he is bound to rebuild, namely, because he has bound himself by an express covenant» Thus where the lessee *539 covenanted to pay the rent, and also repair, except the premises should be demolished or damaged by fire, though the premises were burnt down against his will, and without his fault, yet he tvas held liable to pay the rent — 2 Ld. Raym. 1477, 2 Stra. 763. So it has been held that the tenant could not be released 1'rom his covenant to pay rent, though he had been driven from the premises by the king’s enemies — Aleyn’s Rep. 27. So also, in the case of Pollard vs. Shaaffer, 1 Dall. 210, it was resolved by the supreme court of Pennsylvania, that the tenant who had covenanted to deliver the premises in good repair and to pay the rent, could not be excused from the payment of the rent, although the public enemy during the revolutionary war, had taken possession of the premises, and held them until alter the expiration of the term. Numerous other cases might be cited to this purpose, but it is presumed the oreceding are sufficient to shew that at law it is an established rule, that there can be no suspension or abatement of the rent on account of the destruction of the thing demised.
But the counsel for the plaintiff contended, that the rule in equity is different, and to prove it, cited and relied on the case of Brown vs. Quiltern, Ambler’s Rep. 619. In that case the chancellor expressed himself strongly in favor of relieving the lessee from the payment of the rent, until the lessor would rebuild the house demised. But the lessor having offered in his answer to take back the lease and cancel it, and the lessee choosing to continue tenant without having the house rebuilt rather than give up the lease, the lord chancellor dismissed his bill with costs. In a previous case of Harrison vs. Lord North, 1 Ch. Ca. 83, the lord chancellor, though he expressed his inclination to relieve the tenant against the payment of rent for a house, which during the troubles had been used by parliament as an hospital, does not appear to have given any relief. So that the point seems not to have been decided in either of these cases, and the opinion expressed by the chancellors is opposed by authorities that greatly outweigh it.
In opposition to this opinion, see Carter vs. Cummins, 1 Cha. Ca. 83—1 Fonblanque 378-9—2 Vernon 280, and the case cited from Dallas, of Pollard vs. Shaaffer. The case of Pollard, vs. Shaaffer, is referred to here *540 as settling the rule in equity, hecause the court, in dei livering their opinion, advert to the circumstance of there being no court of chancery in Pennsylvania, but observe that the judges there are to decide according to equity as well as to positive law.
Upon the whole, the weight of authorities seems to establish it as a rule both of law and equity, that the tenant is bound to pay the rent, though the premises demised should be destroyed by inevitable casualty.
This rule, though at first view it appears harsh and rigorous, upon a closer examination will be found to be reasonable, and to comport with principles to which we submit in analogous cases vyithout questioning their, propriety.
The court of Pennsylvania assigns for their decision, the following reasons : 1st. Because of the express covenant to pay the rent, 2dly. As the tenant was to have the advantage of casual profits, he ought to run the hazard of casual losses during the term, and not lay the whole burthen of th -m upnn the lessor ; and, 3dly. Because if a te&un by elegu be interrupted to take the profits of the land by reason of war, he shall not hold over, but shall sustain the disadvantage as resolved in 4 Cok. 81 b. Sir Andrew Carbet’s case. The only reason alleged for the rule in the English books is, that the tenant has expressly covenanted to pay the rent, and has not by his contract provided^against his liability, notwithstanding any accident by inevitable necessity. All these reasons, though varying in their mode of expression, concur in principle, and are predicated upon the presumption that the tenant takes the property subject to every casualty. This principle operates in every sale of property, and where the saléis absolute and the contract executed, we are accustomed to acquiesce in its operation without questioning its correctness. Thus when we sell property, though it should perish in a few weeks or days after we have parted with it, yet, if it were not unsound at the time of sale, we feel ourselves Under no obligation of law or morality, to return the price paid, and the purchaser tacitly submits to the loss without calling in question the rectitude of the rule which binds him to do so. But it is useless to investigate farther, the reasons of the rule. It is considered as established and we have no pewer to alter it, The *541 principle of the rule, it is conceived, applies as strongly, to the case of a hired slave, as it does to the case of de» mised houses or lands.
So iar therefore, as the plaintifPs right to a credit for the physician’s bill, is predicated upon the principle, that he would be entitled to an abatement of the price of hire, on account of the sickness or death of the slave, the law is against him, and his claim must fail. But there is still stronger ground to decide against him. As a bailee to whom the slave was delivered upon the contract of hire, he was bound upon principles of moral light as well as of law, to pay proper attention to the health of the slave. To preserve health, or to restore it in many instances requires the aid of a physician.
In such cases, as the employment of the physician is a necessary mean to the attainment of the end for which the bailee is responsible, he would be bound to use it. A culpable negligence in this respect, would not only Subject him t'1 the loss of the hire, but render him liable for the value of the slave.
So far as arguments founded upon considerations of humanity are pertinent to the case, they militate against the plaintiff, rather than operate in his favor. If he be entitled to no abatement of the price for sickness, and be responsible for any inattention to the health of the slave, then the person taking a slave upon hire, must have every motive which interest can give, to prompt him to treat tbe slave humanely. But ifhe be let loose from the obligation of interest, if he be not bound to employ a physician when necessary, and be entitled to an abatement proportioned to the time the slave is sick, then he can have no incentive to treat the slave humanely, except the mere feelings of humanity, which we have too much reason to believe in many instances of this sort are too weak to stimulate to active virtue.
We are therefore of opinion, that the plaintiff is not entitled to a credit for the amount of the physician’s bill. — r-^Decree affirmed»